Bluefries-New York, Inc. v. Commissioner.
Bluefries-New York, Inc. v. Commissioner
Docket No. 5367.
United States Tax Court
1946 Tax Ct. Memo LEXIS 275; 5 T.C.M. (CCH) 58; T.C.M. (RIA) 46031; January 31, 1946
George A. Conroy, Esq., for the petitioner. Laurence F. Casey, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies for the calendar year 1941, as follows: Declared Value
Excess-Profits
Income Tax
Excess-Profits Tax
Tax
$7,715.33
$7,066.95
$30,298.89
The contested issue is the reasonableness of the compensation of petitioner's president and its secretary-treasurer for the taxable year 1941. Collaterally involved is the reasonableness of the salary paid to petitioner's president in 1943, for determining the amount of the net loss carry-back to the taxable year. Findings of Fact Petitioner is a New York corporation organized in 1940 *276 by John J. Gunther-Mohr, who became its president, and Francis X. Heidl, who became its secretary-treasurer. Gunther-Mohr owned 60 per cent and Heidl, 40 per cent of its outstanding capital stock. Petitioner's Federal corporation tax returns for the period involved were filed with the collector of internal revenue for the second district of New York. Petitioner engaged in the business of international shipping agents, custom house brokers, licensed weighers, processors and export packers of aircraft, tanks, automobiles, trucks and heavy equipment freight brokers, warehousemen and freight forwarders. For a period of years prior to the organization of petitioner, Gunther-Mohr and Heidl held similar positions with The American Bluefriesveem, Inc., which had engaged in many of the activities above described. The American Bluefriesveem, Inc., was a branch of a Dutch corporation which had been in existence for about 300 years and had engaged in warehousing and exporting throughout the world. Of the 750 outstanding shares of The American Bluefriesveem, Inc., Gunther-Mohr owned 78, but Heidl held no stock interest. Owing to complications arising out of the war, The American Bluefriesveem, *277 Inc., suspended its business and petitioner took over its offices, employees and equipment. Gunther-Mohr and Heidl over a period of years had engaged in research and the development of a process for the preparation, packing and boxing of large aircraft for export and were regarded by the trade as experts in that line. Gunther-Mohr was generally recognized as one of, if not the leading figure in the industry. Owing to the reputation these two executives had established, the demand for the character of service petitioner performed continually increased. To meet this demand the two executives were required to devote extraordinary hours of labor in the management and supervision of petitioner's business. In the taxable year 1941, petitioner packed and processed about 700 planes, mostly military aircraft. The following comparative schedule shows the gross billings, gross profits and the amounts paid as compensation to Gunther-Mohr and Heidl by the petitioner and its predecessor: The American Bluefriesveem, Inc.
Gross Profits
Total
from
Salary J.J.
Salary
Officers'
Year
Gross Billings
Operations
Gunther-Mohr
F. X. Heidl
Salaries
1936
$ 271,221.08
$ 55,318.50
$10,200.00
$ 5,700.00
$ 15,900.00
1937
442,233.17
87,727.79
13,200.00
8,500.00
21,700.00
1938
441,347.21
89,393.74
13,200.00
9,200.00
22,400.00
1939
720,079.82
121,553.96
16,630.39
11,486.93
28,117.32
1940
460,317.12
50,977.63
11,637.60
8,158.40
19,796.00
Bluefries - New York, Inc.
1940 (5/15 to 12/31)
1,215,126.91
198,878.35
42,000.00
28,000.00
70,000.00
1941
3,022,641.04
675,290.67
82,600.00 [1]
58,600.00 [1]
141,200.00
1942
2,260,629.67
314,726.52
18,000.00 [2]
54,045.00
76,838.59 [3]
1943
768,471.40
93,799.02
48,000.00 [1]
58,500.00 [3]
1944
685,978.91
82,522.00
*278 At a board of directors' meeting of petitioner held at the commencement of business in May 1940, a resolution was adopted fixing the salary of Gunther-Mohr, as president, at $6,000 per month, and Heidl, at $4,000 per month, commencing with the month of June 1940, until further order of the board. This resolution continued unchanged through the taxable year 1941. On December 19, 1941, the board adopted a resolution awarding bonuses to the officers and personnel of petitioner. Pursuant to that resolution, Gunther-Mohr and Heidl each received $10,600. During the taxable year, petitioner declared and paid dividends aggregating $60,000. In January 1941, Gunther-Mohr became ill and continuously throughout the year had occasional medical consultation with his physicians. He remained mentally alert but found it difficult to get about as formerly. After January 1941, he visited the hangars used by petitioner only four or five times. He visited the offices less often and for short periods of the day. But he *279 maintained an office at his home where he was in frequent, if not daily, telephone consultation with Heidl in reference to the business. Heidl also held frequent personal conferences for the same purpose with him at his home. He died on May 7, 1942. In 1941, petitioner developed a process for the protection of armored tanks which enabled them to arrive in distant ports in usable condition, whereas prior thereto they had not been in a usable condition on arrival. After the entry of the United States into the war, petitioner disclosed this process to the military authorities who thereafter made use of the process. In 1941, the respondent made an investigation of petitioner in connection with its 1940 Federal income tax return. As a result, additional taxes were demanded and paid. The respondent, however, did not dispute or question the salaries paid petitioner's officers, which had been fixed by the board of directors at $6,000 and $4,000 per month, respectively. In July 1942, Heidl and George A. Conroy, who had no stock interest, then constituting petitioner's board of directors, elected a son of John J. Gunther-Mohr to fill the vacancy in the board caused by the death of the *280 latter. At that meeting Heidl resigned as treasurer and was elected to the offices of president and secretary. His salary was continued as fixed by the board in 1940, i.e., $4,000 per month. In September 1942, petitioner employed F. W. Iffinger at a salary of $10,000 per year to take over some of the duties previously performed by Heidl. In 1942, for the balance of the year, Iffinger was paid the sum of $4,793.59 and in 1943, $10,500. The total officers' salaries paid by petitioner in 1943 amounted to $58,500. In July 1942, Heidl acquired from the Gunther-Mohr estate an additional 20 per cent stock interest, so that in 1943 Heidl held a 60 per cent interest and the estate held 40 per cent. After the death of Gunther-Mohr, no member of his family received any moneys from petitioner except by way of dividends. It was stipulated at the trial that petitioner's gross sales in 1943 were $786,471.40; its gross income, $89,714.41; and that it had allowable deductions of $121,201.98, which amount is subject to be increased by whatever amount is found to be a reasonable salary for Heidl for the year 1943. In the taxable year 1941, petitioner claimed as a deduction as compensation paid to *281 Gunther-Mohr the amount of $82,600, and the amount of $58,600 to Heidl. The respondent determined the reasonable allowance to Gunther-Mohr was $46,600 and to Heidl, $34,600, an aggregate of $81,200. The reasonable salary for Gunther-Mohr was $72,000, and for Heidl was $48,000 for the taxable year. The reasonable salary for Heidl in the year 1943 was $48,000. Opinion The first issue involves the reasonableness of the compensation paid to petitioner's two chief executives in the taxable year 1941. Since the two officers were petitioner's only stockholders and the salaries paid were on the same ratio as their respective stockholdings, the respondent contends that to the extent he has disallowed the amounts, they represent distributions of earnings and not reasonable compensation. Except for the amount of $10,600 paid to each officer at the close of the taxable year, the amounts paid as salaries were fixed by resolution adopted at the commencement of business in the prior year. Petitioner places considerable reliance on that fact. Lucas v. Ox Fibre Brush Co., 281 U.S. 115. Conceding the action of the board is ordinarily entitled to great weight, where the salaries involved *282 were those paid to the only two stockholders, who constituted two of a three-member board of directors, we hesitate to give such action the weight that it would have in a different set of circumstances. Whether the sums paid were reasonable salaries is a question of fact. However, notwithstanding the fact that the salaries were fixed in proportion to the stockholdings, we think the record justifies the inference they were reasonably related to the responsibility and character of the service rendered by the respective recipients. Roth Gunther-Mohr and Heidl had been associated together with a predecessor concern for a number of years. Together they had succeeded in developing a reputation for competency and integrity in processing and handling airplanes and heavy equipment for export. Gunther-Mohr was generally recognized as a pioneer and leader in the industry in this country. Heidl was also outstanding in the industry. With the advent of war their services were increasingly sought after. The volume of business and gross profits grew tremendously. Time was of the essence and the added responsibilities resulting from the increased volume of business required these individuals to devote *283 unusual hours of effort and supervision to meet the shipping emergencies due to the war. The skill, efficiency and industry of these two officers enabled petitioner to take care of the increased business and to achieve considerable financial success as well as to make a valuable contribution to the war effort. The reasonable compensation for such service is difficult to evaluate. Petitioner offered the testimony of substantial men, familiar with the character of the work petitioner performed and the standing of its officers in charge, who expressed the opinion the salaries paid were modest. Since, however, this export opinion evidence was based largely on gross profit earned by petitioner rather than on actual services performed, its weight is, we think, materially reduced. The respondent furnished stronger evidence, in our opinion, in the testimony of George C. Dade, president of Dade Bros., Inc. That company was also engaged in processing and transporting airplanes and large equipment, but did not engage in customers' brokerage or warehousing. In 1941, Dade Bros., Inc. processed 650 planes for export shipment. Its officers, all of whom were stockholders, consisted of the father and *284 two sons. In 1941, the gross receipts of Dade Bros., Inc. were $1,250,000 and its gross profit, $333,358.45, or less than one-half that of petitioner. While the respondent's witness, Dade, did not directly express an opinion on the reasonableness of the salaries paid to petitioner's two officers, he stated the compensation paid by his company to its stockholder officers aggregate $121,000, $75,000 of which represented fixed salaries, and a contribution of $46,000 to a pension trust fund for their benefit. In view of this testimony offered by respondent, and his attitude with respect to a similar rate of salary paid in 1940, we do not feel justified in holding that the fixed salaries paid by petitioner in 1941 were unreasonable. It is true that Gunther-Mohr was physically incapacitated to a large extent, beginning in January 1941. But that incapacity did not deter him from carrying on his duties as the executive head of the business - by telephone and personal conference at his office in his home. In addition to the salaries fixed by resolution of the board, petitioner's two officers received, as additional compensation, $10,600 each by way of a year-end bonus for the taxable year *285 1941. The record does not make clear to us any logical reason for making this additional year-end payment, since it is not claimed that the fixed salaries paid were inadequate. In the case of Gunther-Mohr, whose illness during the taxable year prevented him from performing extraordinary services, we see no justification for this payment. Where officers of a corporation own all the stock and an adequate salary has been fixed in advance by resolution of its directors, a further year-end distribution to them squints of an attempt to dispose of surplus in the guise of salaries. We conclude the salaries fixed by the board, aggregating $120,000 in the taxable year 1941, were reasonable, and that the additional compensation, aggregating $21,200, was unreasonable. The remaining question relates to the reasonableness of the salary paid to Heidl in the year 1943 for determining the amount of net operating loss carry-back to the taxable year. [4] In 1942, Gunther-Mohr died and Heidl was elected to the presidency of the petitioner. He also continued as secretary. In July 1942, by action of the board of directors, his salary was continued at $4,000 per month. In 1943 he was paid a salary of $48,000. *286 In the year 1943, due to causes beyond Heidl's control, the gross profit fell to $93,799.02. The respondent contends that a reasonable salary for Heidl for the year 1943 does not exceed $18,000. But volume of business done coupled with the attendant duties and responsibilities is generally a better criterion than profits, per se. Notwithstanding, however, petitioner not only did considerably less business in 1943 but its gross profits fell proportionately, we are convinced that the salary of Heidl should not be correspondingly reduced. Heidl, at the death of Gunther-Mohr in 1942, while still carrying most of his prior duties for which he was being paid $4,000 per month, took over the responsibility of the complete management and supervision of petitioner's business at that same fixed salary. Upon him was cast the burden formerly carried by Gunther-Mohr, who concededly was the dominant factor in petitioner's business. In lieu of the $6,000 per month the petitioner had been paying Gunther-Mohr, Heidl was furnished an assistant at an annual salalry of $10,000. The total salaries paid to officers in 1943 was $58,500, as against $141,200, which was paid to its two officers in 1941, when *287 Gunther-Mohr was active. In 1943, the directors consisted of Heidl representing his 60 per cent stock interest, Jeane Paul Gunther-Mohr representing the 40 per cent stock interest of the Gunther-Mohr estate, and George A. Conroy, an independent director, having no stock interest. Under the circumstances, we think the fair measure of the worth of Heidl's services to petitioner in 1943 is best evidenced by the action taken by petitioner's board of directors. We should be reluctant to find otherwise on this record. Accordingly, we conclude that $48,000 was a reasonable salary for Heidl in the year 1943. Effect will be given to such holding in determining petitioner's net loss for 1943. Decision will be entered under Rule 50. Footnotes
1. Including disputed amounts alleged to represent salaries. ↩
2. To May 7, 1942, date of death. ↩
3. Includes salary of F. W. Iffinger for 1942 of $4,793.59 and 1943 of $10,500.↩
4. Sec. 122 (b), I.R.C.↩, as amended by section 153 (a) of the Revenue Act of 1942.